AMERICAN SURETY CO. OF NEW YORK v. BROAD-
WAY IMPROVEMENT & INVESTMENT CO.
(No. 1369; Oct. 16, 1928; 271 Pac. 19)
(Rehearing denied Feb. 5, 1929)

Hagens & Murane, for plaintiff in error.

198

*Frank England* and *Henry E. Perkins,* for defendant in error.

TIDBALL, District Judge.

The parties will be referred to as in the trial court.

The plaintiff and defendant Martin Robinson made an agreement on October 25th, 1923, by the terms of which Robinson was to provide all the material and perform all the work for the construction of a one-story brick store-room and showroom in Casper, Wyoming, for the price of $23,000.00. The contract provided that the building should be erected according to designated plans and specifications prepared by Rainwater and Epling, architects,

which were made a part of the contract. The contract provided further:

"It is understood and agreed by and between the parties hereto that the said party of the first part (Robinson) shall buy all lumber, steel, brick and other material now on said premises which was bought to be used in connection with this contract for use in the erection of said building."

The contract further provided that the party of the second part (Broadway Improvement and Investment Company) should pay upon estimates of the architects as the work progressed eighty-five percent of such estimates and withhold payment of fifteen percent until thirty days after the building was completed and until the production of proper evidence to show that all labor and material claims had been paid so that no liens could be filed on the building. It was further agreed that all disputes between the parties should be settled by the architects named in the contract and that "their decision shall be considered final." The building was to be completed and ready for occupancy "not later than January 1st, 1924." There was a further stipulation in the contract for a surety bond in the sum of $5,000 payable to the Improvement Company indemnifying it "in full against all loss and damage which said party of the second part may sustain under this contract by reason of liens or other damage which may accrue and that said party of the second part may be required to pay."

The bond was duly executed by the builder with the defendant surety company as surety, in the sum of $5,000 on November 9th, 1923. The bond recites that,

"Whereas, the principal has entered into a written contract dated_____191___, with the obligee for the erection of a brick building on Lot 13 in Block 100, a copy of which is hereto annexed, Now, therefore, the condition of this obligation is such, that if the prin-

cipal shall indemnify the obligee against any loss or damage directly arising by reason of the failure of the principal to faithfully perform said contract, then this obligation shall be void."

The bond further provided that in the event of any default on the part of the principal, a written statement of the particular facts showing such default and the date thereof should be delivered to the surety by registered mail at its office in Denver, Colorado, promptly, and, in any event, within ten days after the obligee or his representative or the architect should learn of such default; that the surety should have the right within thirty days after the receipt of such statement to proceed with the performance of the contract. Another condition of the bond was that no claim, suit or action by reason of any default should be brought against the principal or surety after April 15th, 1924, nor should recovery be had for damages accruing after that date. The bond further provided that no change should be made in such plans and specifications which would increase the amount to be paid the principal more than ten percentum of the penalty of the bond without the written consent of the surety. The building contract above referred to was attached to and became a part of the bond.

In October, 1923, and after the execution of the building contract but before the bond was executed, another agreement was entered into between Robinson, the builder, and the Broadway Improvement and Investment Company, which contract was never accepted by the surety company and concerning the execution of which it had no notice at the time its bond was executed. This contract recited the execution of the former building contract and then provided that "it is the intention and purpose of this agreement that such terms and character of payment be particularly specified and agreed upon between the parties hereto," and then it is provided that "a credit in

the sum of Four Thousand Four Hundred ($4,400.00) Dollars shall be allowed and given by the party of the first part to the party of the second part'' upon the contract price of $23,000, ''upon account of certain lumber and brick which are at this date upon the site where said building is to be erected.'' It then provided that $15,000 cash should be paid upon estimates as provided in the building contract and the balance of the total building price in the sum of $3,600 was covered by a promissory note in that amount running from R. N. Van Sant to the Broadway Improvement and Investment Company and endorsed without recourse to Robinson.

The suit is brought for the purpose of recovering the sum of $4,448.63, which plaintiff claims it was compelled to pay above the contract price of $23,000 on account of the failure of the defendant Robinson to pay for labor and material, as a result of which failure liens were filed against the building in question.

The original petition was filed on November 18th, 1924. The case was tried and the District Court gave the plaintiff judgment in the sum of $3,936.00, together with interest and costs, against the surety company, Robinson not having been served with summons.

The surety company contends that the judgment was erroneous for several reasons:

1. The action was not brought within the time limited in the bond, to-wit: April 15th, 1924.

2. Certain changes were made in the construction of the building so that the plans and specifications were departed from.

3. Plaintiff failed to show it had been damaged in the amount found by the trial court or in any amount.

4. The obligee failed to retain the fifteen percent of estimates as provided in the contract.

5. The contract executed subsequent to the building contract, by virtue of which the price of the material on the ground was fixed at $4,400 and the Van Sant note was

agreed upon, was not binding upon the surety company and materially altered the contract the performance of which the bond insured.

6. The court erred in the admission of evidence.

7. The surety company was not notified of the default of the contractor in the manner provided in the bond.

We shall discuss these propositions in the order named.

The action was not commenced until November 18th, 1924, whereas the bond as above noted provided that action should be commenced on or before April 15th, 1924. We have examined all the cases cited by both parties on this proposition, and many not cited, and there are undoubtedly some cases holding the obligee to a strict compliance with such prevision. See Lesher v. U. S. Fidelity and Guaranty Company, 239 Ill. 502, 88 N. E. 208; Walters v. Fisher, 291 Pa. 311, 139 Atl. 842. Other cases hold that such a stipulation will not be strictly enforced if unreasonable. See Sheard v. U. S. Fidelity and Guaranty Co., 58 Wash. 29, 107 Pac. 1024; Columbia Security Co. v. Aetna Accident Co., 108 Wash. 116, 183 Pac. 137; Cook v. Heinbaugh, 202 Ia. 1002, 210 N. W. 129. In the Sheard case, supra, it is said:

"To determine whether the limitation upon the commencement of the action is reasonable, the bond, the contract, and the facts of the particular case must be considered together."

In the case of Longhurst v. Star Insurance Co., 19 Iowa 364, the court says:

"If, with reasonable diligence, that value cannot be legally ascertained in time to bring an action on the policy within a year from the date of the loss, then it follows (unless you wish to impute a dishonest purpose on the part of the company) that in granting such policy they intended to waive * * * the condition which limits the right of action on the policy to twelve months. By putting this construction upon the contract of insurance

you preserve the upright intent of the company intact. * * * True charity thinketh no evil. It is therefore right for us to presume that it was the honest intent of the company to insure the plaintiff's mechanic's lien. * * * It is the business of the court, in construing the contract, to give effect, if possible, to the real intent and expectations of the parties.''

The case of Cook, et al. v. Heinbaugh (supra) is a very recent case and involves the question we are now discussing. Here was a building contract bonded by the defendant U. S. Fidelity and Guaranty Company. The contract called for completion of the building by July 1st, 1923, and the bond provided that in no event should the surety be liable on any suit instituted later than September 1st, 1923, a period of sixty-two days after the time set for completion of the building. Under the Iowa code a period of sixty days was allowed for the filing of liens after the completion of the contract. The court holds that the time fixed in the bond was unreasonable and therefore voidable and that the general statute of limitations would apply, though recognizing the general rule that parties to a contract may provide a period of limitations shorter than that of the statute, provided it be reasonable.

In Dechter v. National Council of Knights, etc., 130 Minn. 329, 153 N. W. 742, Ann. Cas. 1917 C. 142, it is held that a contract limitation on the time to sue should be strictly construed against the party invoking it and that such provision, if unreasonable, is invalid.

Now, taking up the case at bar, it should be noted that the contract provides for the completion of the building not later than January 1st, 1924, and the bond provided that no suit should be brought thereon later than April 15th, 1924. The period for filing mechanic and labor liens under our statute was, at the date of the contract and bond, and now is, ninety days after the indebtedness accrues. Sec. 4866, Wyoming Compiled Statutes, 1920. We think, as was said in the Sheard case (supra)

that the bond, the contract, and the facts in the particular case must be construed together. So, construing them and according an honest purpose to all parties, we believe it not unreasonable to hold that the intention of the parties was that if the building were completed by January 1st, 1924, then suit should be begun not later than April 15th, 1924. This would probably give a reasonable time to file suits after the expiration of the time for filing liens on the building. But the building not having been completed on the date set, so that the condition on which the limitation period hinged had failed, that period should not be held valid, especially in view of the action of the surety company in keeping Robinson on the job. The building was not accepted by the architects until March 24th, 1924, and, according to the architects' certificate, it was not completed on that date, the architects recommending that $75.00 be withheld on that date to pay for some cement coping and light globes. We therefore hold that, since the condition of the contract providing for completion of the work by January 1st, 1924 was not complied with by the principal and the surety company were instrumental in keeping the principal on the job as hereinafter shown, the limitation period for suing on the bond should not apply. The surety company had knowledge of the failure of the contractor to complete the building on the date mentioned and after such notice entered into extensive negotiations with its principal and the obligee in the bond to cause the completion of the building by the contractor, and did not exercise its option to take over the work of completing the building as it might have done under the stipulations in the bond. The evidence shows that in the latter part of January, 1924, a representative of the investment company had a meeting with Cobb, the vice-president and district manager of the surety company, residing at Denver, and Cody, who apparently was representing the local representative of the insurance company. At this meeting, the evidence

of the plaintiff shows, Cobb stated that he was there to get the mess straightened out, and asked for statements of unpaid bills, but the representative of the investment company was unable to furnish them at that time. At that time he stated that he wanted to get Robinson, his principal, lined up to complete the job. One of the witnesses for the plaintiff, who represented the improvement company during the erection of the building, testified that he allowed Robinson to go ahead at Cobb's request. At that meeting Cobb admitted the liability of his company on the bond. The surety therefore waived the condition for the completion of the building by January 1st, 1924.

We think the contention of the surety company that it is relieved from liability on the bond because of certain changes made in the building contrary to the plans and specifications needs little discussion. The bond, as above noted, contained a provision that no such changes should be made that increased the cost of the building more than $500 without the written consent of the surety, thus recognizing the right to make such changes if they did not increase the cost of the building more than $500. The heating plant was changed, at no additional cost, according to the testimony of at least one witness. Other evidence relating to other clauses consisted partly of estimates made by the architects, one of which was an estimate showing $512.16 due for extras and the other showing deductions for omitted items in the sum of $630.50. These architects' estimates were objected to by the defendant on the ground of incompetency. It is perhaps true that such estimates would not be competent to show the actual value of such extras and deductions. But in addition to this it was shown that while the contractor at first seems to have thought that the cost would be somewhat increased by the changes, he finally stated, after talking with the architect and his own foreman that it would be ''as broad as it was long'' so far as the cost

of the changes was concerned, these changes apparently consisting mainly in leaving out partitions downstairs and putting them in upstairs. It may be that the estimates above mentioned were admissible in connection with this testimony. See 9 C. J. 880. However that may be, plaintiff in error pleaded as an affirmative defense that these changes increased the cost of the building to the extent of ten per cent of the penalty of the bond, apparently in accordance with the rule in such cases as Norwegian etc. Congregation v. United States Fidelity & Guaranty Company, 81 Minn. 32, 83 N. W. 487; National Surety Company v. Haley, 58 Okla. 263, 159 Pac. 292; Zalesky v. Fidelity & Casualty Co., 176 Iowa 267, 157 N. W. 858. But plaintiff in error introduced no testimony in support of this defense. It contented itself by showing that changes were made. But, clearly, the contract was not violated, unless the changes exceeded ten per cent of the penalty of the bond. That not being shown, or attempted to be shown, we can see no possible prejudice in the admission of the testimony above mentioned.

It is next contended that the evidence fails to show that the plaintiff was damaged the amount of the judgment given by the trial court or in any amount. The evidence of the plaintiff, which the court had a right to believe, shows that the plaintiff paid out directly from its funds $18,031.63, that the builder accepted material on the ground valued at $4,400, and that one Van Sant paid out for the plaintiff under an agreement between Van Sant and the plaintiff the sum of $5,408.14, making a total of $27,839.77 paid by the plaintiff or caused to be paid by it. This would amount to $4,839.77 above the contract price of $23,000.00. Defendant in error argues at length that Van Sant, and not plaintiff, paid out the foregoing item of $5,408.14, and that plaintiff was not liable to reimburse Van Sant for this amount, and that it, accordingly, cannot be considered as part of the amount in which plaintiff was damaged. It may be said in an-

swer, first, that plaintiff in error agreed to erect the building for $23,000.00, and that it is hardly in position to question the manner in which the excess amount was paid or caused to be paid by the plaintiff; second, that Van Sant would, doubtless, though the record is not clear on this point, have an equitable or moral claim against the defendant in error for the amount, for he had a right to rely on the fact, or at least had a moral right to insist, that the building should be erected for $23,-000.00 and that he would not be compelled to pay any liens, or at least that plaintiff would, in so far as it could, protect him against loss, and would enforce the contract which it had for the erection of the building for the sum of $23,000.00. The claim of plaintiff in error reduces itself to the proposition that the loss incurred because of the violation of its contract should be cast upon Van Sant, an innocent party, because he, perhaps, had not sufficiently protected himself in his contract with the defendant in error. We cannot consent to any such proposition. The fact that the contract in question provides that "no right of action shall accrue upon or by reason hereof, to or for the use or benefit of any one other than the obligee herein named" does not alter the situation. The claim herein is being enforced by the defendant in error for its benefit, so as to discharge, if not its legal, at least its moral obligation.

Complaint is also made that the obligee failed to retain the fifteen percent of the estimates as provided in the contract. On February 11th, 1924, a written agreement was made between Robinson, the principal on the bond, and the surety company for the release of $1,500 of such retained percentages and its payment to the local agent of the surety company at Casper to be applied on labor bills, and that such payment was not to release the surety company from liability under its bond. Some objection seems to be made that it was not shown that Norvell H. Cobb, resident vice-president and manager of the surety com-

pany,. and I. Taylor, resident assistant secretary, had authority to sign this agreement. However, Norvell H. Cobb was shown by the evidence to be the vice-president and general manager of the company, and he is the same person who executed the original bond; the agreement bears the seal of the company, and Cobb certifies at the bottom of the agreement that he did have authority to execute the instrument by order of the board of directors of the surety company, and there was no evidence offered to the contrary by the surety company. We- think this amply sufficient. The evidence further shows that all the money paid out by the plaintiff or by Van Sant for the plaintiff was applied to bills due for work and material, and that the surety company was not prejudiced in any way by such payments.

The burden is on the surety company to show failure to retain the fifteen percent. Hormel & Company v. American Bonding Co., 112 Minn. 288, 128 N. W. 12, 33 L. R. A. (N. S.) 513. No attempt seems to have been made by it to sustain this burden, except as to the item of $4,400 above mentioned. This item was allowed for material on the ground. The contract and bond provide for retained percentages on the estimates of the architect, and the item for $4,400 did not, accordingly, come within the requirement of the retention of fifteen per cent. And while no contention seems to be made as to the remaining amount, it may be stated that so far as the record discloses, the required percentage was retained. Deducting the $4,400 from the contract price, leaves the sum of $18,600 on which 15 per cent was required to be retained, or a total of $2,790. $1,500 of this amount was turned over to the surety company as above mentioned. The testimony shows that the sum of $6,963.97 was paid out for liens and other claims after the completion and acceptance of the building, which would leave the sum. of $30,484.66 which was paid out previous. to that time and which included the $1,500 above mentioned. De-

ducting this $1,500 would leave the sum of $18,984.63 paid out before the completion of the building, and which, deducted from the contract price of $23,000 would leave the sum of $4,015.37 retained, or much more than the sum of $2,790 required as above mentioned.

As to objection No. 5 of the surety company, that the supplemental contract was not attached to the bond and therefore constituted a variance from the contract signed by the surety company, it is true that the supplemental contract was not attached to the bond and the surety company, according to the evidence, had no notice of it; hence it was not a part of the company's contract, and if it constituted a departure from that contract, the company would not be bound by it; but the original contract contemplated that the material on the ground should be taken over by the builder at some price (see the provision above set out), and the supplemental contract, it appears to us, only fixed the value of the material, a thing the original contract must have contemplated would be done. Had the provision for taking the Van Sant note been carried out, that would probably have been a material alteration of the original contract, but that was not done, the evidence showing that Van Sant paid out cash for the improvement company in the sum of $5,408.14 on bills for labor and material that went into the building, so we do not regard the supplemental contract, as carried out, an alteration of the original contract as accepted by the surety company.

Objection is made as to rulings of the trial court on the evidence. We have discussed the ruling as to the admission of the architects' estimates concerning additions and deductions and have held that their admission for the purpose for which they were received was without prejudice, even if erroneous. As to the other matters, we hold them also immaterial errors, if errors at all. They consisted mainly of certificates and receipts from the different creditors showing that their lien claims had been

paid. The defendant surety company did not attempt to show that such bills were not paid, and the oral evidence is to the effect that they were.

The last point is that the surety company was not notified of the default of Robinson by registered mail at Denver, as required by the bond, but the evidence clearly demonstrates that the company had personal notice in January, 1924, and acted upon such notice, as shown above in our discussion of Objection No. 1, the vice president and general manager of the company, Cobb, coming from Denver and making a personal examination of the whole affair, and from time to time thereafter sending some employee of the company there to investigate. Meetings were held at which representatives of all interested parties were present, and the whole matter was thoroughly investigated by the surety company. It is difficult to see how that company could have done more by way of investigation had the notice been by registered mail rather than by personal notification. The purpose of the provision for notice was to make reasonably certain that the surety company would become aware promptly of any default by its principal. It did become aware of it as soon as known to the plaintiff. In the case of Bross v. McNicholas, et al., 66 Ore. 52, 133 Pac. 782, Ann. Cas. 1915 B. 1272, it is said:

"Since it has become common for corporations to become sureties for an adequate consideration, the strictness of the old rules regarding suretyship has been relaxed, and a surety company must show some injury caused by failure to give notice, as required in the bond, before it can be absolved from its contract."

In the case of Hormel & Company v. Bonding Company, 112 Minn. 288, 128 N. W. 12, 33 L. R. A. (N. S.) 513, it is said:

"The object of requiring notice to be given of the contractor's default which may involve loss was to enable

the surety company reasonably to take such practicable action as might prevent or minimize loss by reason of the default, and it is not to be strictly construed for or against either party, but reasonably as to both.''

The court, in the case of St. Matthew's Evangelical Lutheran Church v. U. S. Fidelity and Guaranty Co., 222 Mich. 256, 192 N. W. 784, has this to say:

''It is claimed the notice of default of the contractor, given by plaintiff to defendant, omitted to specify the date of the default, as required in the bond, and that this was fatal. It might have been a good point had the defendant cared to raise it at the time of notice of default, but it lost all force when defendant acted upon the notice  *   *   *.''

. Another case illustrative of the matter under discussion is that of Rule v. Anderson, et al., 160 Mo. App. 347, 142 S. W. 358. In this case the bond required an immediate written notice by registered mail to be sent to the surety company at New York, in case the principal defaulted in the performance of any matter or thing in the contract specified to be performed by the principal. The principal failed to complete the work on the date specified and the obligee took the matter up personally with the managing agent of the surety company in Kansas City and did not notify the surety company at New York of the default until about two months after it occurred. Thereupon the surety company immediately notified the obligee that it stood on the provisions of the bond as to immediate notice and refused liability on the bond. However, the managing agent of the surety company at Kansas City in the meantime had, as in the case at bar, arranged for the principal to go ahead with the work. The court held that the surety company was bound, saying:

''Finally, it is argued by the surety that the failure of plaintiffs to give written notice of the breach of the building contract by the contractor in respect of the

stipulation relating to the time in which the improvement should be completed constituted a forfeiture of the bond. That point is sufficiently answered by the observation that this ground of forfeiture was one the surety could waive, and we hold that the conduct of the manager of the company's office at Kansas City, as depicted in the evidence of the plaintiffs, was a waiver on that ground."

We have found one case opposed to the doctrines as laid down in the cases above cited, and that is the case of American Indemnity Co. v. Board of Trustees of School District, Texas Civil App. 200 S. W. 592, in which it is said that actual notice to the surety company of the default will not alter the rule that the notice provided for in the bond must be given. However, we prefer what seems the more reasonable rule as laid down in the other cases cited, and therefore hold the failure to give the notice as required by the bond under the facts as they here exist not fatal to a recovery on the bond. We place this holding on two grounds: First, the surety company had actual notice of the default, and, second, by its act in going ahead with the contract and keeping the principal on the job it waived any right it might otherwise have had to declare a forfeiture of the bond because of the failure to give notice in the manner specified in the bond. In this connection it is interesting to note that the surety company did not repudiate liability on the bond until May 23rd, 1924, and then claimed exemption from liability only on the ground that the suit was not begun by April 15th, 1924.

From what we have said it follows that the judgment herein should be affirmed and it is so ordered.

*Affirmed.*

BLUME, Ch. J., and KIMBALL, J., concur.

214

*Per Curiam:*

A petition for rehearing has been filed herein.

We stated in the original opinion that the plaintiff in error agreed to erect the building in question for $23,000.00. That was, of course, an error, and we should have said that Robinson, for whom the plaintiff in error was surety, agreed to do so. The point, however, is immaterial.

Before proceeding to discuss the next point urged in the petition for rehearing, a few facts should be stated not mentioned in the original opinion. On May 24th, 1924, Broadway Improvement and Investment Company, herein briefly called the Improvement Company, the defendant in error, entered into a written contract with Van Sant, leasing him the building in question and the lot on which it stood for the period of five years, at a monthly rental of $395.83 for the first year and a somewhat reduced rental for the following years. The same instrument gave Van Sant the option to purchase the premises for $15,500.00 plus any additional amount which the Improvement Company might be compelled to pay for lien claims against the premises, the option to run during the whole term of the lease, the usual forfeiture clause in leases in case of default being inserted. The Improvement Company having already paid out more than $15,500, it made arrangements with Van Sant to pay the amount of $5408.14 mentioned in the original opinion, this amount being paid, as Van Sant testified, "as rent and toward the purchase price." It was the contention of counsel for the surety company on the original hearing and it is their contention now, that Van Sant was obligated, under the lease and option agreement above mentioned, to pay the amount which he paid as above mentioned, that the amount is greater than the amount of the judgment herein, that Van Sant, under the foregoing contract, had no legal action against the Improvement Company to be reimbursed for the amount which he paid, and that hence that company sustained no damages whatever. We

held that this contention could not be sustained. The point was given more than careful consideration when the original opinion was written. We were unable to see any ground upon which the surety company could claim any release from liability under such conditions, and we are unable to see any now, even if the reason given in the original opinion is wrong. No cases so holding have been cited, and none, we think, to that effect can be found. Counsel for the surety company summarizes our holding on that point as follows: ''The obligee (in a bond) need not prove that he has suffered any damages in fact. It is sufficient if he is either under an equitable or moral obligation to a third party for moneys expended by such third party. Legal liability need not be proved.'' We did not mean to go that far in our holding. Aside from what we said as to the equitable or moral claim that Van Sant might have, we meant to hold substantially to the effect that when the Improvement Company made arrangements with Van Sant to pay the amount above mentioned, Van Sant acted as its agent, and that the surety company is not in position to question or inquire into the liability of the parties to the lease and option agreement above mentioned *inter se*. This was held on the theory that the surety company was not a party to that agreement, nor privy thereto, nor was it made for its benefit, and that, accordingly, it could not derive any incidental benefit therefrom; for the rule appears to be general that unless a contract is entered into for the benefit of a third party, the latter cannot sue thereon (13 C. J. 703-705), which would seem to imply that he cannot derive any benefit therefrom; and it is indeed said by Elliott on Contracts, Sec. 1406, that ''it is a familiar rule that no one but the parties to a contract can be bound by it or obtain rights under it.'' And this would seem to be at least partially on the theory that to hold otherwise would deprive parties of the right to contract among themselves as they please. And if this is the law, then the bond sued on herein must necessarily be construed in the light of that

rule; and in that event the evidence as to the lease and option agreement was wholly improper and could not be taken into consideration in this case whatever. In fact the very rule that no person not privy to a contract can derive any benefit therefrom is sought to be applied by counsel for the surety company, when they assert that the Improvement Company cannot sue for damages sustained, though at its request, by Van Sant. We may, however, withhold our definite decision on that point, and withdraw from the original opinion the portion which deals with the equitable or moral claim of Van Sant, and leave these matters for future consideration, for the reason that it clearly appears, we think, that the Improvement Company sustained a loss, that the amount paid by Van Sant must be taken into consideration in that connection, and that the assumption of counsel that there was no legal liability on the part of the Improvement Company toward Van Sant on account of such payment is wholly wrong. The amount paid by the latter kept his lease and option good for the period of approximately fourteen months. The Improvement Company was under binding obligation, in return for the payment by Van Sant, to let him use and occupy the premises for that period of time, and the value of such use and occupancy, and with which the Improvement Company parted, was worth, as fixed by the contract, the exact amount paid by Van Sant. Hence it is clear that the contention of counsel on this point cannot be sustained. The situation would, perhaps, be somewhat different, in case Van Sant exercised his option and paid out the whole purchase price; but the option extended over a period of five years; whether he would exercise it or not was, as recognized by counsel for the surety company, wholly within his exclusive power and discretion, was speculative and conjectural at the time when this action was brought and tried, even though Van Sant may have so thought at the time of the trial that he would exercise it—as he seems to have thought according to some of his testimony—and because of these facts, we

cannot take that matter into consideration in this case. Pacific Wyoming Oil Company v. Carter Oil Co., 31 Wyo. loc. cit. 460; Martel v. Hall Oil Company, 36 Wyo. loc. cit. 177.

We may look at the matter from another standpoint. We do not think that there can be any doubt that the amount of the liens paid by Van Sant entered into the purchase price. It is similar to a case in which a man sells land to another with a mortgage against it, which the purchaser assumes.

Counsel further state in their brief on rehearing that we held that "damages can be proved by producing receipts and certificates." We need not say whether they can be or not. We do not, in any event, believe that anything contained in the original opinion can be so construed. We merely held that in view of the oral evidence and other facts in the case, the admission in evidence of receipts and certificates was not prejudicial.

Not perceiving any reason for a rehearing, the same is denied.

*Rehearing Denied.*